**William O. SHUMAN, Jr.**

v.

**CITY OF PHILADELPHIA, Honorable Frank Rizzo, Mayor, City of Philadelphia, Honorable Hillel Levinson, Managing Director, City of Philadelphia, Honorable Joseph O'Neill, Police Commissioner, City of Philadelphia, Staff Inspector, John Clark and Staff Inspector, Howard Schultz, Police Department, Honorable Louis Taylor, Personnel Director, City of Philadelphia, Honorable George Bucher, Harrison J. Trapp, Leonard L. Ettinger, Civil Service Commissioners, City of Philadelphia, and the Civil Service Commission, City of Philadelphia, Individually and in their official capacities.**

Civ. A. No. 75–1510.

United States District Court, E. D. Pennsylvania.

April 18, 1979.

Stanley Bashman, Philadelphia, Pa., for plaintiff.

Stephen T. Saltz, Deputy City Sol., Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, DISCUSSION AND ORDER

HUYETT, District Judge.

Plaintiff William O. Shuman was dismissed from his employment with the Philadelphia Police Department on May 15, 1975. He brought this action pursuant to 42 U.S.C. § 1983 seeking reinstatement, back-

pay, and other declaratory and injunctive relief, on the grounds that his dismissal was a violation of his rights under the First, Fourth, and Fourteenth Amendments to the Constitution.[1] Jurisdiction of this court is founded on 28 U.S.C. §§ 1343 and 2201. Following a trial held non-jury, we make the following Findings of Fact and Conclusions of Law.[2]

In late 1974, the plaintiff and his wife Rona Shuman decided to separate and eventually to file for divorce. The actual separation took place in mid-January of 1975. (N.T. 8–11; 15) Plaintiff had in the meantime become romantically involved with eighteen year old Donna Rosenbaum, a fellow student at Temple University.[3] On or about January 16, 1975, Ms. Rosenbaum[4] secretly left her home, where she had been living with her parents, and went to live at plaintiff's father's house at 3538 Calumet Street in Philadelphia, where plaintiff was living at the time. (N.T. 17, 80) Several weeks later, Ms. Rosenbaum went to live at the residence of plaintiff's mother at 7592 Germantown Avenue in Philadelphia.

Donna Rosenbaum's mother Mrs. Berta Rosenbaum, was upset that her daughter had left home. In early January, 1975, Mrs. Rosenbaum made a telephone complaint to the Police Department, stating that her daughter had left her parents' home and was living with plaintiff. On January 23, 1975, Mrs. Rosenbaum made a complaint to the Internal Affairs Bureau of the Philadel-phia Police Department. (Stipulations ¶ 8, 9) Staff Inspector John Clark was assigned to investigate the complaint. After a brief informal, discussion with plaintiff in which plaintiff stated that Ms. Rosenbaum was not living with him, Clark closed the investigation. (N.T. 118–119)

Mrs. Rosenbaum, however, persevered. On February 20, 1975, she wrote a letter to Police Commissioner Joseph O'Neill stating that she and her husband wished to continue to "press charges" against plaintiff since their daughter had not returned home. Within the next month, Mrs. Rosenbaum wrote three more letters on the same subject. (Stipulation ¶¶ 11–12; Court Exhib. No. 1 B, C, D) The general message conveyed by these letters was that, because of the plaintiff's actions, Mrs. Rosenbaum had lost all respect for the Philadelphia Police Department and that she would not regain respect until Commissioner O'Neill had "taken care of" this situation. Following receipt of the letters, the investigation of plaintiff was resumed. (Stipulation ¶ 13)

The Internal Affairs Bureau, under the direction of Staff Inspector Clark, commenced twenty-four hour surveillance of Shuman and Donna Rosenbaum. Surveillance continued from the end of February, 1975, until early April, 1975, for approximately forty to forty-five days. The surveillance allegedly revealed that plaintiff and Ms. Rosenbaum were observed entering the premises at 3538 Calumet and 5104 Ger-

1. Plaintiff's amended complaint requests that this court enter a declaratory judgment that defendants' acts violate plaintiff's rights under the First, Fourth and Fourteenth Amendments to the Constitution, and that no provision of the Philadelphia Home Rule Charter, particularly § 10–110, can constitutionally prevent plaintiff from exercising his rights. The amended complaint further requests the issuance of an injunction prohibiting defendants from acting in the manner alleged to be unconstitutional and requiring defendants to adopt written regulations which are constitutionally valid. Finally, plaintiff requests that he be reinstated with full backpay and be awarded punitive and compensatory damages.

2. The following shall constitute Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52. In the interests of ease of comprehension, the Findings are in narrative form.

3. Plaintiff was a full-time student at Temple University during this time period. He was able to arrange his schedule with the Police Department so that he could pursue his education while being employed as a police officer. N.T. 15, 26–27.

4. Plaintiff and Ms. Rosenbaum subsequently were married on January 17, 1976, after plaintiff's divorce became final. Although Ms. Ro-

mantown Avenue [5] at various times of the day, and that they were observed on occasion entering these residences at night and coming out together in the morning. (Stipulation No. 20)

As a result of the continuing complaints of Mrs. Rosenbaum and the outcome of the surveillance, the plaintiff was again notified that he would be questioned about his relationship with Donna Rosenbaum by the Staff Inspector's office. Plaintiff and his lawyer met with Staff Inspector Clark in mid-April and discussed the situation. At that time no formal statement was taken, but the parties informally discussed the nature of the investigation. (N.T. 122–23) Staff Inspector Clark informed the plaintiff and his attorney that the investigation was an official police investigation, and that failure to answer questions propounded in such an investigation were grounds for dismissal under § 10–110 of the Philadelphia Home Rule Charter. That section reads as follows:

> Section 10–110. Refusal to Testify. If any officer or employee of the City shall wilfully refuse or fail to appear before any court, or before the Council or any committee thereof, or before any officer, department, board, commission or body authorized to conduct any hearing or inquiry, or having appeared, shall refuse to testify or to answer any question relating to the affairs or government of the City or the conduct of any City officer or employee on the ground that his testimony or answers would tend to incriminate him, or shall refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify before such court or at any such hearing or inquiry, he shall forfeit his office or position, and shall not be eligible thereafter for appointment to any position in the City service.

Following that discussion, the parties agreed that an official interview would be held on April 22, 1975, at which time a formal statement would be taken from plaintiff.

At the April 22 meeting, an official statement was taken and transcribed. Staff Inspector Clark informed the plaintiff that:

> This is an official departmental investigation and under the provisions of the Philadelphia Home Rule Charter, section 10–110, you are required to cooperate fully and answer all questions. We are questioning you concerning a complaint made by Mrs. Berta Rosenbaum.

(Stipulation ¶ 26) Later during the questioning, plaintiff was asked if he lived with anyone at 5104 Germantown Avenue. After being informed that this line of questioning concerned his off-duty personal life, plaintiff's lawyer stated:

> Inspector, it is the position of Patrolman Shuman and the Fraternal Order of Police that the Department has no right under the City Charter or any other regulation or Ordinance or state law to inquire into the personal life of Patrolman Shuman or any other policeman and therefore, Patrolman Shuman, of his own free will, has decided to refuse to answer any questions concerning any complaint having to do with his personal life.

In response to further questioning, plaintiff maintained that the Staff Inspector had "no right under the City Charter to inquire into my personal life as long as it does not involve the performance of my duty as a police officer." (Exhibit "E" to the Stipulations)

On April 22, 1975, plaintiff was called back to the Staff Inspectors' office and given a chance to reconsider his decision not to give a statement. He continued to refuse to do so. That same date, charges were filed against the plaintiff and he was suspended from the police department without pay. On May 5, 1975, plaintiff received a Notice of Intention to Dismiss. The stated reasons for the dismissal were as follows:

---

senbaum's name is presently Donna Shuman, in order to avoid confusion, we will refer to her throughout this opinion as Donna Rosenbaum.

5. The residence at 5104 Germantown Avenue was a property purchased by plaintiff on or about April 8, 1975. N.T. 33.

*CONDUCT UNBECOMING AN OFFI-CER* : You induced, Donna Rosenbaum, 18 years, Female, single, to leave the residence of her parents at 17 Rusthill Rd., Levittown, Pa., and take up residence with you at 5104 Germantown Ave., Phila., Pa., while you were in a married status.

On April 22, 1975, you refused to answer questions in an official departmental investigation into this matter in violation of Section 10–110 of the Philadelphia Home Rule Charter.

The above actions indicate that you have little or no regard for your responsibility as a member of the Philadelphia Police Department.

(Exhibit "I" to Stipulations) On May 15, 1978, plaintiff was dismissed for the above stated reasons. (Stipulation ¶¶ 30–31)

Several major areas of factual dispute have emerged from this case. One involves the proper interpretation of § 10–110 of the City Charter. Since plaintiff refused to answer the questions propounded to him because he believed that the instant investigation wrongfully infringed upon his personal life, § 10–110 on its face does not appear to be directly applicable. That section only applies to refusals to answer based upon Fifth Amendment rights. Plaintiff here refused for other reasons to respond to questions propounded to him. However, separate and apart from the rule stated in § 10–110, we find as a fact that there was a longstanding, well-known policy within the Police Department to require, at penalty of losing one's job, that police officers answer any questions asked during an official investigation, irrespective of the reasons advanced for the failure to respond. Commissioner O'Neill testified that it was a long-standing policy throughout his tenure in the Police Department to require officers to give statements in departmental investigations. Furthermore, Staff Inspector Clark testified that this "policy" was common knowledge within the Police Department, and was part of the curriculum at the Police Academy. (N.T. 124; 2–9)

We further find as fact that there were no limits placed upon the matters which could be inquired into during an official investigation. See Stipulation ¶ 24. As Staff Inspector Clark put it, his function was "to investigate complaints at the pleasure of the police commissioner." (N.T. 116) Police Commissioner O'Neill also testified that it was traditionally the responsibility of the police commissioner to decide what matters would be the subject of official investigations. (N.T. 2–5) No limits or guidelines on official investigations have ever been established, either through official documents or by testimony given at trial. In particular, we find that the scope of "official investigations" was not limited to the kinds of offenses which are grounds for disciplinary action, as those grounds are set forth in the Police Duty Manual. The Duty Manual lists several specific charges which constitute "Conduct Unbecoming an Officer." The testimony at trial revealed that plaintiff was investigated for possible violation of the regulation prohibiting involvement in "crimes of moral turpitude." Adultery has not been a crime in Pennsylvania since the enactment of the Crimes Code, Act of December 6, 1972, No. 334, effective June 6, 1973. Therefore, adulterous behavior is not a *"crime of moral turpitude,"* and does not violate any express regulations of the Police Department.[6]

---

**6.** The trial testimony concerning this matter is instructive. For example, Staff Inspector Clark testified that he checked with Esther Sylvester of the Philadelphia District Attorney's office concerning the status of adulterous behavior as a "crime of moral turpitude." Clark further testified as follows:

    A. She [Ms. Sylvester] told me it was not a crime against the laws of the Commonwealth of Pennsylvania, but it is, of course, a crime against the laws of the police department.

    Q. Where, in the laws—you mean they are different?

    A. Sure.

    Q. Well, show me where in the laws of the police department there exists a statement that people can know about and are taught about it in the Academy that say that you can't live in adultery?

Nevertheless, the testimony at trial revealed that such conduct was the subject of routine investigation by the Department. (N.T. 2–13 through 2–15)

Similarly, any conduct deemed to be an "*act* of moral turpitude" has regularly been subject to investigation, even where the conduct occurs while an officer is off-duty. (N.T. 197–199) Exactly what constitutes an "act of moral turpitude" is not defined anywhere, and we find as a fact that whether or not an act is deemed "immoral", and thus subject to official investigation, largely depends upon the personal standards of the particular police commissioner. In the words of Staff Inspector Clark, ". . . the morals are dictated by the Police Commissioner." (N.T. 144)

A second area of factual dispute concerns the exact cause for plaintiff's dismissal. Defendants have argued throughout that the sole reason for the plaintiff's dismissal was his failure to answer the questions propounded to him during the official investigation. Plaintiff, on the other hand, submits that he was dismissed for his allegedly adulterous behavior. Although two reasons are given on the plaintiff's notice of dismissal, we find as a fact that the only reason for his dismissal was plaintiff's failure to answer questions asked at an official investigation. At the time plaintiff gave his statement, the investigation was in its beginning stages. There simply would have been no basis to dismiss plaintiff on substantive grounds at that point. (N.T. 2–12) However, his refusal to answer the questions stymied the investigation, and, on that basis, the decision to dismiss was made.

Finally, we find that defendants Clark and O'Neill acted at all times in good faith, without any specific intent to deprive the plaintiff of his constitutional rights, and did not in fact believe that their actions deprived plaintiff of those rights. There was no evidence that their acts were done with any malicious intention to harass or cause injury to the plaintiff. Rather, these defendants were proceeding in a routine manner to investigate a complaint made against plaintiff, in accordance with a longstanding departmental policy.

## I

Defendants have raised several preliminary matters. First, defendants contend that this court should abstain, under the doctrine of *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), from deciding the issues raised in this case. Alternatively, defendant claims that we should dismiss this action because of the plaintiff's failure to exhaust administrative remedies. It is undisputed that the plaintiff initiated an appeal of his dismissal in the state Civil Service Commission, which appeal was continued at the request of plaintiff's counsel pending the outcome of this litigation.

The doctrine enunciated by the Supreme Court in *Railroad Commission of Texas v. Pullman, supra,* is based upon the discretionary exercise of a court's equity powers to decline to adjudicate certain claims in order to avoid needless friction between federal pronouncements and state policies. *Id.* at 500, 61 S.Ct. 643. The Third Circuit has recently summarized the special circumstances which must be weighed by the district court as follows:

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts which would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important policies.

*D'Iorio v. County of Delaware*, 592 F.2d 681 (3d Cir. 1978).

A. Mr. Bashman, adulterous conduct affects the reputation of the police department.
Q. That is your opinion.

A. It is the opinion of the police commissioner and the police department.
N.T. 141–42.

The defendants argue that the interpretation of § 10–110 of the Philadelphia Home Charter, and the issue of whether it was constitutionally applied in the instant case, are unresolved issues of state law, thereby rendering abstention proper. However, the defendants have not brought to our attention any way in which the interpretation of § 10–110 constitutes an unclear issue of state law; on the contrary, the interpretation of that section seems to be quite clear indeed. The abstention doctrine does not require a federal court to defer to a state court's judgment as to the validity under the federal constitution of an unambiguous state enactment.

However, even assuming *arguendo* that the interpretation of § 10–110 is unclear as a matter of state law, we do not believe that the abstention doctrine is appropriate in this case.

A state court interpretation of § 10–110 would not "obviate the need for . . . the adjudication of the constitutional claims," since this court would still be faced with the question of the constitutional validity of the unwritten Police Department policy of dismissing employees who refuse to answer questions in an official investigation. This policy, as we have found, exists separate and apart from the policy embodied in § 10–110. Therefore, the proper interpretation of § 10–110 is irrelevant to many of the issues in this case.

Finally, we note that § 10–110, on its face, is simply not applicable to the plaintiff's dismissal, since that section only deals with the consequences of refusing to answer questions based upon an assertion of Fifth Amendment rights. However, the basis for plaintiff's refusal was not the Fifth Amendment; but rather plaintiff's perception that questions relating to his personal life were inappropriate. Therefore, we must conclude that it would be improper to abstain in the instant case.

As respects the argument that dismissal is proper because of the plaintiff's failure to exhaust administrative remedies, we conclude that this contention is also

without merit. It has long been accepted that exhaustion is not a prerequisite to federal jurisdiction in actions under § 1983. *E. g.*, *Ellis v. Dyson*, 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *United States ex rel. Ricketts v. Lightcap*, 567 F.2d 1226 (3d Cir. 1977).

## II

Defendants have moved to dismiss the City of Philadelphia from this action. In reliance upon the Supreme Court case of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), we decline to do so.

Defendants have alleged that the City cannot be sued pursuant to 42 U.S.C. § 1983 because it is not a "person" within the meaning of that statute. During the pendency of this suit, however, the Supreme Court in *Monell* overruled *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) insofar as that case held that municipalities were wholly immune to suits under § 1983. In defining those instances where a municipality may be sued, the Court stated:

Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received

formal approval through the body's official decisionmaking channels.

436 U.S. at 690–91, 98 S.Ct. at 2035–2036.

The facts in this case fit within the scope of municipal liability under § 1983, as set forth in *Monell.* Plaintiffs have challenged an officially recognized policy of the Police Department: to wit, the policy of investigating matters involving a police officer's personal, off-duty life and requiring that an officer answer, at pain of losing his job, all questions propounded to him at official investigations of such off-duty matters. Whether this challenge is framed as an attack on § 10–110 of the City Charter, as the parties have contended, or as a test of an unwritten yet widely-recognized official policy, as we believe, the prerequisites for municipal liability under § 1983 have been met.

### III

■ We start with the proposition that the government may not condition public employment upon compliance with unconstitutional conditions. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 628 (1967). "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann,* 408 U.S. 593 at 597, 92 S.Ct. 2694, at 2697, 33 L.Ed.2d 570 (1972).

Plaintiff here argues that his employment was conditioned upon the answering of questions posed to him at an official investigation; questions which related to his personal, off-duty behavior. Plaintiff contends that the Police Department was without justification for making such inquiries where they had *no* connection with his on-duty job performance, in that the inquiries made intruded upon plaintiff's constitutionally protected right of privacy. In terminating plaintiff because of his refusal to answer such questions, the Police Department was burdening that right.

■ Plaintiff's argument is based upon two distinct, yet unarticulated, premises. First, the plaintiff must assume that compelled disclosure of private, personal information, unrelated to performance of his duties, is in itself violative of his constitutional right of privacy. The Supreme Court, in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), characterized cases allegedly protecting "privacy" as protecting two distinct kinds of interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* at 599, 97 S.Ct. at 876. The interest protected here is the former. Absent a strong state interest justifying disclosure of certain types of personal information, such information is protected from compelled disclosure. *Cf. N.A.A.C.P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (compelled disclosure of an organization's membership list infringes upon members' First Amendment rights); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (compelled disclosure by public employees of all organizations to which they belong violates employees' First Amendment rights.)

In the context of the First Amendment rights of association, the policy justifying the ban on compelled disclosure is clear. The fear is that compelled disclosure may place a chill on the free exercise of constitutional rights protected by the First Amendment. As noted in *Shelton v. Tucker, supra,* which involved an attack on the constitutionality of an Arkansas statute compelling teachers to file yearly an affidavit listing without limitation every organization to which they have belonged over the last five years:

It is not disputed that to compel a teacher to disclose his every associational tie is to impair that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. . . . Such interference with

personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made—those who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain.

*Id.* at 485, 81 S.Ct. at 251.

In the area of privacy, the hesitation to compel disclosure may rest upon different grounds. If there is a constitutionally protected "zone-of-privacy", compelled disclosure in and of itself may be an invasion of that zone, and therefore, a violation of protected rights. Absent a strong countervailing state interest, disclosure of private matters should not be compelled.

In *Whalen v. Roe, supra,* the Supreme Court was faced with a challenge to the constitutionality of a New York statutory scheme for maintaining computerized records of all prescriptions for certain dangerous, but lawful, drugs. Under the scheme, the records would also include the identity of the patient for whom the drug was prescribed. The statute was challenged on the basis that the existence of this information in a relatively accessible form threatened "to impair both [the patients'] interest in the nondisclosure of private information and also their interest in making important decisions independently." *Id.* 429 U.S. at 600, 97 S.Ct. at 877. The Supreme Court, however, upheld the statute. Justice Stevens, writing for a unanimous court, discussed the serious problems which prompted the enactment of the record-keeping procedures, and the safeguards which were employed by the state to prevent unauthorized disclosure, and concluded that the risk of such disclosure, as compared with the state's interest in gathering the information, was too insubstantial to present a genuine risk to patients' right of privacy. *Id.* at 603, 97 S.Ct. 869.

The mode of analysis used by the *Whalen* Court appears to be akin to a balancing test, whereby the state's interests in disclosure are weighed against the privacy needs of the individual. Where the individual's

substantive rights are themselves highly protected, as in *Shelton* and *N.A.A.C.P. v. Alabama,* the balance almost invariably would predominate in favor of the individual. 429 U.S. at n. 32. In other cases, such as in *Whalen* and *Nixon v. Administrator of General Services,* 433 U.S. 425, 455–65, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the individual's privacy interest may be so attenuated or insubstantial, and the state's interest by comparison so strong, that disclosure of private matters may be compelled. *Cf. American Federation of Government Employees v. Schlesinger,* 443 F.Supp. 431 (D.D.C.1978). The important thing about the *Whalen* decision, however, is that it recognized the existence of a legitimate strand of the privacy right involving "the individual interest in avoiding disclosure of personal matters." 429 U.S. at 599, 97 S.Ct. at 876.

The second unarticulated premise of the plaintiff's argument is that the interest which the plaintiff is asserting in this case, involving his relationship with Donna Rosenbaum, is one that is within the "zone of privacy" which has gained constitutional protection. While the Supreme Court has stated on occasion that only "fundamental" rights are within this zone; *see, e. g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1863); the kinds of interests protected have never been completely and exhaustively articulated. With respect to matters which are the subject of intimate decision-making, we note that the kinds of rights protected have related primarily to personal decisions concerning "marriage, . . . procreation, . . . contraception, . . . family relationships, and child rearing and education." *Roe v. Wade, supra* at 152–53, 93 S.Ct. at 726 (citations omitted).

However, there are also matters which fall within a protected zone of privacy simply because they are private; "that is, that [they do] not adversely affect persons beyond the actor, and hence [are] none of their business." *Ravin v. State,* 537 P.2d 494 (Alaska 1976). *See* Comment, A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision, 64 Cal.L.Rev. 1447

(1976). These private matters do not necessarily relate to the exercise of substantive rights, but may simply constitute areas of one's life where the government simply has no legitimate interest. These are the kind of interests aptly characterized by Justice Brandeis as "the right to be let alone." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion).

■ We conclude that a party's private sexual activities are within the "zone of privacy" protected from unwarranted government intrusion. Such a conclusion flows inevitably from the cases holding that such matters as contraception, abortion, and marriage are private matters within this "zone." *See Roe v. Wade, supra; Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

■ With respect to the instant case, the plaintiff's private sexual activities are within this protected zone.[7] However, even though activities such as those engaged in by plaintiff may be within the protected "zone of privacy," this protection is by no means absolute. For example, if the sexual activities of a public employee were open and notorious, or if such activities took place in a small town, the public employer might very well have an interest in investigating such activities and possibly terminating an employee. *See Sullivan v. Meade Independent School District*, 530 F.2d 799 (8th Cir. 1976); *cf. Hollenbaugh v. Carnegie Free Library*, 436 F.Supp. 1328 (W.D.Pa. 1977), *aff'd without opinion*, 578 F.2d 1374 (3d Cir. 1978). In such a case, the actions of the public employee with respect to his or her private life could be deemed to have a substantial impact upon his or her ability to perform on the job.

■ We may concede, then, at least for the purposes of argument, that the Police Department has an interest and may legitimately investigate some areas of personal, sexual activities engaged in by its employees where those activities impact upon job performance. *Cf. Bruns v. Pomerleau*, 319 F.Supp. 58 (D.Md.1970). However, we are compelled to conclude that there are many areas of a police officer's private life and sexual behavior which are simply beyond the scope of any reasonable investigation by the Department because of the tenuous relationship between such activity and the officer's performance on the job. In the absence of a showing that a policeman's private, off-duty personal activities have an impact upon his on-the-job performance, we believe that inquiry into those activities violates the constitutionally protected right of privacy.[8] *Battle v. Mulholland*, 439 F.2d

---

7. We reach this conclusion even though plaintiff was in fact married to another person at the time of the activities in question, and therefore, the sexual activities involved were technically adulterous. Since, plaintiff and his former wife were separated and had instituted divorce proceedings at the time of these events, and since, according to his former wife's testimony, there was no possibility of a reconciliation, any interest society may have had in preserving the marriage was diminished.

8. There are two distinct lines of cases which we believe support this conclusion. The first involves the situation where a public employee challenges a discharge which was motivated by the fact that the employee is a homosexual. Several courts have concluded that a person cannot be dismissed from public employment solely because he or she is a homosexual. *E. g., Saal v. Middendorf*, 427 F.Supp. 192 (N.D. Cal.1977) (military service); *Society for Indi-*

*vidual Rights, Inc. v. Hampton*, 63 F.R.D. 399 (N.D.Cal.1973), *aff'd on other grounds*, 528 F.2d 905 (9th Cir. 1975) (Civil Service Commission); *Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969) (Civil Service Commission). The rationale for these decisions is that dismissal solely because of one's status as a homosexual is "so arbitrary and capricious as to violate due process." *Society for Individual Rights, Inc. v. Hampton, supra* at 400. However, the courts so holding have also recognized that homosexual activity may be grounds for dismissal if the behavior impairs the employer's efficiency or otherwise impacts upon job performance. *Compare Norton v. Macy, supra, with Singer v. United States*, 530 F.2d 247 (9th Cir. 1976) *vacated and remanded*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977) (court upheld dismissal of homosexual who engaged in "notorious conduct and open flaunting and careless display of unorthodox sexual conduct in public.") We believe that these cases

321 (5th Cir. 1971); *Bruns v. Pomerleau, supra; Drake v. Covington County Board of Education,* 371 F.Supp. 974 (M.D.Ala.1974) (three-judge court). The Police Department simply cannot have a *carte blanche* to investigate all aspects of a police officer's personal life.

In the case before us, the Police Department has in effect granted to itself the unlimited power to investigate all aspects of an officer's private life. The Department has set no limits on the power to the Staff Inspectors to probe sensitive personal areas other than "the pleasure of the Police Commissioner." The scope of "official investigation" is not limited even by the Police Department's own disciplinary rules, or by any requirement that the private behavior which is the subject of investigation have any impact whatsoever upon an officer's job performance. In other words, there exists a system whereby Staff Inspectors, pursuant to "official police investigations", may question police officers concerning any and all aspects of an officer's personal private life, regardless of the possible connection between the officer's personal activities and any legitimate concern the Police Department might have with the effect of those activities on the officer's on-the-job performance; the police officer is required to answer such questions on penalty of losing his job. We have no doubt that such a policy is unconstitutional.

█ The evil in such a policy is that it is not narrowly tailored to meet those legitimate interests of the Police Department. While the state arguably has a greater interest in regulating the conduct of its employees than that of citizens in general, *cf. Pickering v. Board of Education, supra,* that interest arises from concerns relating to the proper functioning of the particular employing entity. For example, the Police Department may have a legitimate interest in maintaining the efficiency and discipline of the Department. *See Gasparinetti v. Kerr,* 568 F.2d 311 (3d Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). To the extent that an officer's private life impacts upon these legitimate needs, then, the Police Department would have an interest in regulating, and concomitantly, investigating such activities. However, investigations which exceed the bounds set by the legitimate needs of the Department trample upon constitutionally protected zones of privacy.[9]

stand generally for the proposition that behavior which is considered "immoral" may be a basis for discharge of a public employee only where that behavior ceases to be private and impairs the employee's job performance or the efficiency of the employing agency. *But cf. Matter of Dalessandro,* 397 A.2d 743, 758–59 (Pa., 1979) (In disciplinary action, judge's adulterous relationship not grounds for discipline even though it is open and notorious).

A second line of cases deals with activities engaged in by police officers while off-duty and discusses the degree to which those activities may be used as a basis for excluding persons from employment with the Police Department. For example, in *Bruns v. Pomerleau,* 319 F.Supp. 58 (D.Md.1970), the court was faced with a challenge by a nudist to a police department policy excluding him from employment. While conceding that "the behavioral pattern of a policeman off duty as well as on is of paramount interest to the Department," the court further added that "What [a policeman] does in his private life, as with other public employees, should not be his employer's concern unless it can be shown to affect in some degree his efficiency in the performance of his job." *Id.* at 67. *See also Battle v. Mulholland,*

439 F.2d 321 (5th Cir. 1971) (dismissal of black police officer because he and his wife permitted two white single women to board with them, where police department claimed that the officer's living situation might have an adverse impact upon the racial tension in a southern town, was not justified in the absence of a showing that "his conduct would materially and substantially impair his usefulness as a police officer.")

**9.** We recognize the distinction between *dismissal* of a public employee for certain acts, and *investigation* of those acts. The matters into which an employer may legitimately inquire may be broader than those which would justify a dismissal. We believe, however, that an employer should be required to make some preliminary showing of job-relatedness before investigating areas that are wholly private. *See American Federation of Government Employers v. Schlesinger,* 443 F.Supp. 431 (D.D.C. 1978). Since the Philadelphia Police Department had set no limits or guidelines on the scope of its investigations, we are not confronted with the issue of whether any existing guidelines relate to the legitimate needs of the employer; nor are we confronted with a factual

Additionally, we find that there is widespread danger of abuse in permitting a public employer to maintain such broad investigative power into the private decisions of its employees. Under the policy followed by the Police Department, for example, a policewoman could be terminated for failing to reveal whether she has had an abortion. *Cf., Drake v. Covington County Board of Education, supra.*

■ In sum, to rephrase the words of Justice Stewart, this policy's interference with privacy rights "goes far beyond what might be justified in the exercise of the [Police Department's] legitimate inquiry into the fitness and competency of its [employees]." *Shelton v. Tucker,* 364 U.S. 479, 490, 81 S.Ct. 247, 253, 5 L.Ed.2d 231 (1960). We therefore hold that the widely acknowledged policy of the Police Department whereby police officers are required upon penalty of losing their jobs, to answer all questions propounded in an "official investigation", even though the questions have no bearing upon an officer's job performance, is unconstitutional.

In plaintiff's case, the Police Department's policy was applied in an unconstitutional manner. The Staff Inspector's office proceeded to investigate plaintiff's personal activities and relationship with Donna Rosenbaum, without regard to whether or not those activities had any connection whatsoever with the performance of plaintiff's duties as a police officer. In point of fact, all of the evidence presented to us at trial established that plaintiff's activities were done privately, unobtrusively, and without publicity. Following extensive surveillance of plaintiff and Ms. Rosenbaum for over a month, the Staff Inspector's office commenced an "official investigation" of plaintiff's personal sexual activities. Plaintiff was never told how his personal life could have had any impact upon his on-the-job performance, and, in fact, Staff Inspector Clark, at the time of the investigation, expressly denied that the official investigation concerned any matters having to do with

plaintiff's performance of his official duties. In view of the Police Department's failure to establish the relevance of the official investigation of plaintiff Shuman to the legitimate concerns of the Police Department, either at the time plaintiff was interrogated or at the time of trial, we must conclude that plaintiff could not constitutionally be forced to answer questions concerning his personal life at the pain of losing his job.

We therefore find that plaintiff was wrongfully dismissed pursuant to an unconstitutional policy of the Police Department which infringed upon his right of privacy.

### IV

In view of the conclusions stated above, the only question which remains is an assessment of the appropriate relief. In the plaintiff's amended complaint, he requests declaratory relief; reinstatement, backpay, and various other kinds of injunctive relief; and compensatory and punitive damages. At oral argument, plaintiff's counsel conceded that all individual defendants except for Commissioner O'Neill and Staff Inspector Clark were sued in their official capacity only, and with respect to these individuals only injunctive and declaratory relief was sought. Plaintiff continues to seek backpay and other compensatory relief from the City, Commissioner O'Neill, and Inspector Clark.

■ We order, first, that defendant be reinstated as a police officer with the Philadelphia Police Department at a rank and pay comparable to that he possessed at the time he was terminated illegally. We further declare that the policy which was the basis of plaintiff's dismissal, as that policy was described above, is unconstitutional; and we enjoin the defendants from enforcing that policy in the future.

We now consider the extent, if any, to which the defendant is entitled to monetary relief. O'Neill and Clark both assert a qualified immunity from damage liability.

situation where the employee was informed of the potential link between his personal life and

the legitimate needs of his employer and nevertheless refused to answer questions.

This qualified immunity is based upon such cases as *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1975) and *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), where the Supreme Court defined a qualified, good faith immunity for executive officers acting within the scope of their official duties. In *Wood*, the Court concluded that a school board member is liable for damages under § 1983 only if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.* at 322, 95 S.Ct. at 1001. We conclude that the same test is applicable in a case such as this.

■ We found as a fact that neither Commissioner O'Neill nor Staff Inspector Clark knew that they were violating the plaintiff's constitutional rights, nor did they act with malicious intent to cause such a deprivation. The more difficult question is whether they should have known that their actions were unconstitutional—or, stated more precisely, that the policy they were implementing was unconstitutional. After examining all of the circumstances surrounding this case, we conclude that the individual defendants' claim of qualified immunity is proper under this objective prong of the *Wood* test. First of all, we take into consideration the fact that the policy implemented here was longstanding and recognized widely throughout the Police Department. This factor is not necessarily determinative, since a person may be reasonably expected to recognize a blatantly unconstitutional policy notwithstanding its lengthy history. However, in this case the nature of the constitutional right being protected, the privacy right, is in the midst of evolution. Defendants here cannot be "charged with predicting the future course of constitutional law." *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1966). *Cf. Sullivan v. Meade Independent School District*, 530 F.2d 799, 808 (8th Cir. 1976). Under the circumstances, we cannot conclude that the defendants can be said to have violated the plaintiff's "clearly established [constitutional] rights." *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. 992. Defendants Clark and O'Neill will not be held personally liable for compensatory or punitive damages.

The remaining question is the liability of the City for backpay or other damages. The resolution of this question requires an examination of several closely related issues: First, can a municipality assert a qualified good faith immunity? If so, is the good faith of the municipality dependent upon or identical with the good faith of the individual defendants? And finally, even if a good faith immunity attaches, does this bar payment of backpay, which is in the nature of an equitable remedy?

An intelligent discussion of these issues requires some discussion of developments in the law prior to the Supreme Court's decision in *Monell v. Department of Social Services, supra.* Because of the holding in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and its progeny that a municipality was not a "person" within the meaning of that term as used in § 1983, parties who sought backpay or other equitable relief of a monetary nature attempted to obtain it through the device of suing individual defendants "in their official capacity." Many cases had held that monetary equitable recovery was permissible under this theory. *See, e. g., Thomas v. Ward*, 529 F.2d 916 (4th Cir. 1976); *Burt v. Board of Trustees*, 521 F.2d 1201 (4th Cir. 1974); *Incarcerated Men of Allen County v. Fair*, 507 F.2d 281 (6th Cir. 1974); *D'Iorio v. County of Delaware*, 447 F.Supp. 229, C.A. No. 77–1241 (E.D.Pa. Feb. 22, 1978), *rev'd on other grounds*, 592 F.2d 681 (3d Cir. 1978).

On the other hand, there were also cases which held that recovery of equitable monetary relief against individuals acting in their official capacity was not permissible. *See, e. g., Muzquiz v. City of San Antonio*, 528 F.2d 499 (5th Cir. 1976) (en banc); *Monell v. Department of Social Services*, 532

F.2d 259 (2d Cir. 1976), *rev'd on other grounds* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The rationale for these cases was that an award of backpay or other equitable, monetary relief would be, in effect, an award against the municipality. This, the courts opined, would contravene the Congressional intent, as interpreted in *Monroe v. Pape*, to exclude municipalities from the scope of § 1983 liability. When the Supreme Court granted certiorari in *Monell*, the question that was presented for consideration was:

> Whether local governmental officials and/or local independent school boards are "persons" within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?

In view of the holding in *Monell* that municipalities are "persons" within the meaning of § 1983, the issue discussed above is presumably moot, since there is no longer a need to sue individuals in their official capacity in order to recover backpay against a municipality.

Our research has revealed no pre-*Monell* cases permitting recovery of monetary equitable relief from individuals acting in their official capacity which expressly discussed whether or not the defense of good faith immunity successfully asserted by a person in his *individual* capacity would also be a bar to recovery against him in his *official* capacity. However, in *Thomas v. Ward, supra,* the court affirmed the portion of a district court judgment which denied recovery of monetary damages against individual officials because of their good faith, while deciding that backpay could be awarded against them in their official capacity. This result appears to be in accordance with the reasoning behind the doctrine of good faith immunity, which has as its goal the protection of officials acting in good faith in the execution of their duties from the potential of large damage awards assessed against them personally. *See Wood v. Strickland, supra.* Where the award is assessed instead against the Board, the official is not penalized personally.

The Supreme Court decision in *Monell v. Department of Social Services, supra,* raised the issue of the possible applicability of a qualified immunity in the case of a municipality, but expressly did not decide that issue. The Court stated:

> Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties or addressed by the courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 "be drained of meaning." *Scheuer v. Rhodes,* 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

436 U.S. at 701, 98 S.Ct. at 2041. Therefore, while the Court clearly ruled out the possibility that a municipality might have total immunity, the possibility of a qualified immunity remains.

Since the *Monell* decision, we have been able to locate only one decision which has passed directly upon the question of qualified municipal immunity under § 1983, *Bertot v. School District No. 1,* No. 76–1169 (10th Cir., November 15, 1978). In *Bertot,* the jury had answered a special interrogatory with respect to the good faith of school board members in dismissing the plaintiff, finding that the individual members had acted in good faith. After the trial, but before the case was decided on appeal, the Supreme Court decided *Monell.* Therefore, the Tenth Circuit was squarely presented with issue of the applicablilty of a qualified immunity to the Board itself. In holding that a qualified immunity was properly applied to the Board, the court stated that "The individuals with this qualified immunity conduct the official board business, make the decisions, and carry on the official business. If they have such immunity, there would seem to be no reason why it should not be carried into their collective actions as a Board." *Id.*

It should be noted that *Bertot* dealt, not with the application of an official Board policy, but with the ad hoc decision not to hire a specific teacher. Thus, although we accept the possibility that a good faith immunity might be applicable to a municipality in some situation, we question the automatic applicability of the doctrine in all cases where good faith immunity is successfully asserted by the individual defendants, especially where an established policy is being attacked. As an example of the difficulty in applying a qualified immunity in such a case, we note that in our case, the individual defendants are the *executors* of the policy, but not necessarily the *formulators* of that policy. It does not make sense, then, to automatically apply the doctrine of qualified immunity to the municipality in all cases where the doctrine is successfully asserted by the individual defendants.

 We conclude that in a case such as this, where a policy of a municipality is under attack, the doctrine of good faith immunity is not applicable. *Cf. Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569 (7th Cir. 1975). (In a suit brought against the school board under § 1331, damages were assessed against the board, although individual members successfully asserted good faith defense.)

 Alternatively, we conclude that any immunity which might be applied would not bar equitable relief. Since backpay is a species of equitable relief, we conclude that the award of backpay incident to a decree of reinstatement is proper. The language in *Wood v. Strickland, supra*, which refers to the assertion of good faith immunity, only speaks of shielding individual defendants from damage awards. We have been able to find no case that has ever shielded an individual defendant from equitable relief because of a finding of good faith immunity. Furthermore, those pre-*Monell*

cases which concluded that individuals could not be sued in their official capacity for equitable monetary relief did so on the grounds that such relief would constitute an indirect liability assessed against the municipality, which was barred under § 1983 by *Monroe v. Pape, supra. E. g., Muzquiz v. City of San Antonio, supra.* We conclude, therefore, that plaintiff should be awarded backpay, and that this award may be assessed against the City.

 The remaining relief requested by the plaintiff is denied.[10]

---

10. We deny the plaintiff's request that we require defendants to "adopt and promulgate written regulations which are constitutionally valid setting forth with specificity under what circumstances, and in what manner" the defendants may require its employees to give answers to questions posed during an "official inquiry." Plaintiff's Complaint. We believe that to do so might tend to impinge upon the Police Department's " 'latitude in the dispatch of its [own] internal affairs.' " *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and may exceed the proper exercise of this court's equitable powers.