Patricia T. VIA, f.k.a. Patricia
T. Toomey, Plaintiff,

v.

Stan TAYLOR, Robert Watson, Alan
Machtinger, and Rick Kearney,
Defendants.

No. Civ.A. 97–4–JJF.

United States District Court,
D. Delaware.

Sept. 11, 2002.

David A. Boswell, Schmittinger & Rodriguez, P.A., Rehoboth Beach, Delaware, for plaintiff.

Michael F. Foster, Deputy Attorney General of the Department of Justice of the State of Delaware, Dover, Delaware, for defendants.

## MEMORANDUM OPINION

FARNAN, District Judge.

This action was brought by Plaintiff, Patricia T. Toomey[1], a former employee of the Delaware Department of Correction, against Defendants, Stan Taylor, Robert Watson, Alan Machtinger and Rick Kearney, alleging that Defendants wrongfully fired her from her job at Sussex Correctional Institute Inc. ("SCI") as a result of her off-duty relationship with a paroled former inmate, Richard Via. The parties stipulated to a bench trial and agreed to sever the issues of liability and damages.

The Court conducted a three-day bench trial. Following the trial, the Court instructed the parties to submit proposed findings of fact and conclusions of law and to address evidentiary objections which were raised during the course of this litigation. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the claims and defenses presented.[2]

## BACKGROUND

The Court takes its background of the facts in this case from both the stipulated pretrial order and the testimony and documents offered at trial. However, this factual background is not exhaustive, and the Court will make additional factual findings as needed in the context of the Court's analysis of the claims and defenses in this litigation.

## I. The Circumstances Of Plaintiff's Employment And Termination

Plaintiff was employed as a Correctional Corporal by the Department of Correction (the "Department") from 1978 until her discharge in 1995. (D.I. 98 at ¶ i.) The Department is an agency of the State of Delaware. (*Id.* at ¶ b.) The Department is divided into separate divisions, including the Bureau of Prisons and the Bureau of Community Corrections. (*Id.*) The Bureau of Prisons operates the prison facilities throughout the State of Delaware. (*Id.*) The Bureau of Community Corrections includes a statewide division known as Probation and Parole, and the Sussex Work Release Center located in Sussex County, Delaware. (*Id.*) The Sussex Work Release Center is a separate facility from SCI, and has its own warden.

At the time of Plaintiff's termination, Defendant Taylor was the Chief of the Bureau of Prisons. (*Id.* at ¶ c.) Currently,

---

1. Plaintiff married Richard Via in 2000 and took his surname. To avoid confusion in this litigation, Plaintiff refers to herself using the name she had during her employment with Defendants.

2. The Court has addressed evidentiary objections raised during trial by a separate Memorandum Order issued concurrently with this Memorandum Opinion.

Defendant Taylor is the Commissioner of the Department. Defendant Robert Watson is the former Commissioner of the Department. (*Id.* at ¶ d.) At all relevant times, Defendant Alan Machtinger has been the personnel director of the Department, and Defendant Rick Kearney has been the Warden of SCI. (*Id.* at ¶¶ e, f.)

As a Correctional Corporal at SCI, Plaintiff's duties included supervising inmates who worked in the SCI Commissary, maintaining inventory and security, and otherwise directing Commissary operations. (*Id.* at ¶ j.) One of the inmates under Plaintiff's supervision was Richard Via, who was serving a sentence imposed by the Delaware Superior Court. (*Id.* at ¶ k.)

In June 1994, Mr. Via was placed on work release through the Sussex Work Release Center of the Department. (*Id.* at ¶ 1.) Mr. Via was then paroled. When Mr. Via left SCI for Sussex Work Release Center, he was no longer under the supervision of Plaintiff or the Bureau of Prisons. Rather, Mr. Via was then under the supervision of the Bureau of Community Corrections. (*Id.* at ¶ m.)

On December 30, 1994, following his release from the Sussex Work Release Center, Mr. Via moved into Plaintiff's home as a boarder. While Plaintiff was a boarder with Plaintiff, Mr. Via was under the supervision of Probation and Parole and the Bureau of Community Corrections. (*Id.* at ¶ o.)

On January 3, 1995, her first day of work following December 30, 1994, Plaintiff reported the boarding arrangement to Defendant Kearney, the Warden of SCI. (*Id.* at ¶ p.) Plaintiff was required to report this arrangement pursuant to the Department's Code of Conduct. Defendant Kearney consulted by telephone with Defendant Taylor and Defendant Machtinger regarding Plaintiff's boarding arrangement with Mr. Via. After consultation, Defendant Kearney advised Plaintiff that the boarding arrangement with Mr. Via violated the Code of Conduct. (*Id.*)

On July 10, 1995, Plaintiff had a predecision meeting about her potential termination with Defendant Machtinger. (*Id.* at ¶ q.) At that time, Plaintiff advised Defendant Machtinger that she had developed an intimate relationship with Mr. Via. Defendant Machtinger advised Plaintiff that the Department was considering terminating her employment as a result of her relationship with Mr. Via. Defendant Machtinger also advised Plaintiff that if she terminated her relationship with Mr. Via, the Department would consider that to be a factor in her favor. Plaintiff refused to terminate her relationship with Mr. Via and was subsequently terminated from her employment for violating the Code of Conduct. (*Id.*) Plaintiff's work performance was not an issue, and played no part in the Department's decision to terminate her. (*Id.* at ¶¶ s, y.)

## II. The Code Of Conduct

The Code of Conduct (the "Code") was established by the Department in 1988 while Defendant Taylor was Chief of the Bureau of Prisons. Defendant Watson, who was then the Commissioner of the Department, commissioned the Code in response to public outcry following a prison escape which resulted in a citizen's death. (Tr. A 35.) The Code is a policy document intended to enhance professionalism in the Department. The stated purpose of the Code is to:

> set[ ] out high moral and ethical standards for correctional employees to assure unfailing honesty, respect for dignity and individuality of human beings and a commitment to professional and compassionate service.

(PX1 at 1.)

The Code is given to the Department's employees in their training classes, and

employees are required to sign for their receipt of the Code. (Tr. A–25–29; B–216–217.) The Code applies to "all staff unless otherwise specified." (PX1 at 1.) The portion of the Code at issue in this litigation is Article 16, which provides in relevant part:

> Trafficking with incarcerated offenders is prohibited. No staff person shall have any personal contact with an offender, incarcerated or non-incarcerated, beyond that contact necessary for the proper supervision and treatment of the offender. Examples of types of contact not appropriate include, but are not limited to, living with an offender, offering an offender employment, carrying messages to or from an offender, social relationships of any type with an offender, and physical contact beyond that which is routinely required by specific job duties. Any sexual contact with offenders is strictly prohibited. Contact for other than professional reasons with the offenders outside of the work place shall be reported in writing to the employee[']s supervisor.

(D.I. 98 at t, PX1 at 5, 7, 8–9.) The term "offender" is defined in Article 29(k) of the Code as "[a]ny person committed by a court to the care, custody, or control of the Department." (D.I. 98 at ¶ t.) The prohibition described in Article 16 does not distinguish between types or degrees of officer/inmate relationships and on or off duty relationships. Article 16 also contains no disciplinary standards. Defendants make case-by-case determinations as to whether and what degree of discipline should be imposed as a result of a violation of the Code, including Article 16. (D.I. 98 at ¶¶ ab–ac.)

## DISCUSSION

### I. Whether The Code's Prohibition On Contact With An "Offender" Violates Plaintiff's Rights To Freedom Of Association And Privacy

Plaintiff contends that Defendants violated her rights under the First and Fifth Amendments to freedom of association and privacy by terminating her as a result of her relationship with Mr. Via. Specifically, Plaintiff challenges the constitutionality of Article 16 of the Code, the provision upon which her termination was based. Plaintiff contends that her relationship with Mr. Via was a protected expressive association, a protected personal association, and a protected privacy interest such that the use of Article 16 to justify her termination as a result of her relationship with Mr. Via amounted to a violation of her rights.[3]

#### A. The Degree Of Constitutional Protection Afforded To The Right To Engage In Personal Associations

 In discussing "freedom of association" under the First Amendment, the United States Supreme Court has created two lines of decisions. *Roberts v. United States Jaycees*, 468 U.S. 609, 617, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435, 438 (3d Cir.2000). In one line of cases, the Court has recognized that the choice to enter into and maintain intimate human relationships is a fundamental element of personal liberty which must be secured against undue intrusion by the State. *Roberts*, 468 U.S. at 618, 104 S.Ct. 3244. In another line of cases, the Court has recognized the right to associate for the purpose of engaging in activities protected by the First Amendment, such

---

**3.** In the Court's view, Plaintiff's relationship with Mr. Via is best characterized as a personal association, and therefore, the Court declines to address Plaintiff's claim that her relationship with Mr. Via constituted a protected expressive association.

as speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id.* The nature and degree of constitutional protection afforded to the freedom of association varies depending on the nature of the association and the nature of the interest at stake. *Id.*

Insofar as personal associations are concerned, the Supreme Court has recognized that certain kinds of highly personal relationships are afforded a "substantial measure of sanctuary from unjustified interference by the State." *Id.* Personal associations which reflect "relative smallness, a high degree of selectivity in the decision to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship" are considered intrinsic elements of personal liberty. *Id.* at 620, 104 S.Ct. 3244. In contrast, associations lacking these qualities, such as large business-type associations, are less likely to implicate personal liberty concerns. By way of example, the Supreme Court has explained that the Constitution "imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees." *Id.* Thus, to determine the degree of protection afforded to a particular personal association, the Court must assess "where the relationship's objective characteristics locate it on a spectrum from most intimate to the most attenuated of personal attachments" considering such factors as size, purpose, policies, selectivity, congeniality and other relevant characteristics. *Id.* at 620, 104 S.Ct. 3244.

After considering the characteristics of Plaintiff's personal relationship with Mr. Via, the Court concludes that Plaintiff's relationship falls on the higher end of the spectrum of protected personal associations. Plaintiff invited Mr. Via into her home on a personal basis, and not for business-type reasons. Plaintiff also developed an intimate relationship with Mr. Via during her off-duty hours. Accordingly, the Court concludes that Plaintiff's relationship with Mr. Via is the type of small, selective, secluded relationship warranting a heightened degree of protection from State intrusion.

There are two forms of heightened scrutiny, intermediate scrutiny and strict scrutiny. Under the strict scrutiny analysis, a regulation impinging on a fundamental right must serve a compelling state interest that cannot be achieved through less restrictive means, i.e. be narrowly tailored. Under intermediate scrutiny, the regulation must serve an important (rather than compelling) government interest, and be substantially related (rather than narrowly tailored) to that interest. *See Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Where, as here, a public employee's right to personal, off-duty, intimate associations has been implicated by a government regulation, courts have applied the intermediate scrutiny standard of review. *See e.g. Kukla v. Village of Antioch,* 647 F.Supp. 799, 808 (N.D.Ill.1986) (holding that "cohabitation and sexual choice fall in the category of rights given intermediate scrutiny in public employee discharge cases" for both freedom of association and the right to privacy); *Reuter v. Skipper,* 832 F.Supp. 1420, 1423 (D.Or. 1993) (holding that intermediate scrutiny applies to county sheriff's rule prohibiting employees from associating with ex-felons).

The application of intermediate scrutiny varies depending on the context of each case. *Bartnicki v. Vopper,* 200 F.3d 109, 123 (3d Cir.1999). Although intermediate scrutiny is meant to be a flexible test, "it always encompasses some balancing of the state interest and the means used to

effectuate that interest." *Id.* Applying intermediate scrutiny in cases involving regulations affecting the personal association and privacy rights of government employees, courts have weighed and examined such factors as the nature of the right at stake, the nature of the government interest, the degree to which the regulation burdens the right, the degree to which the regulation promotes the efficiency of the government service provided, and whether the conduct impacted by the regulation would have a significant negative impact on the individual's job performance, the operations of the government entity involved or the public's perception of that entity.[4] *See e.g. Kukla,* 647 F.Supp. at 808.

### B. The Degree Of Constitutional Protection Afforded To Privacy Rights Involving Cohabitation And Sexual Choice

■ Invoking the Due Process Clause of the Fourteenth Amendment, the United States Supreme Court has recognized that constitutional protection extends to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing and education. *Planned Parenthood v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Zablocki v. Redhail,* 434 U.S. 374, 384–385, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (collecting cases). However, the degree of constitutional protection afforded to these private decisions depends on the nature of the interest at stake. An individual's decision to cohabitate with another individual or engage in sexual activity are within the zone of privacy afforded some constitutional protection, but they are not considered fundamental rights. *Kukla,* 647 F.Supp. at 807 (collecting cases illustrating that sexual decisions among consenting adults are not fundamental rights and may be regulated by the state); *Shuman v. City of Philadelphia,* 470 F.Supp. 449, 459 (E.D.Pa.1979) (recognizing that private sexual activities are within zone of privacy, but are not absolute rights, particularly where a public employee is involved). Accordingly, courts have concluded that regulations impacting the privacy interests in cohabitation and sexual activity of public employees should be evaluated under the intermediate scrutiny standard of review. *See e.g. Kukla,* 647 F.Supp. at 808.

### C. Whether The Code's Prohibition Against Contact With An Offender Withstands Intermediate Scrutiny

■ Applying intermediate scrutiny to the regulation at issue in this case, the Court concludes that the regulation fails to

4. Some courts have applied a modified version of the *Pickering–Kelley* balancing test as a form of intermediate scrutiny when considering regulations impacting the association rights of public employees. *Ross v. Clayton County, Georgia,* 173 F.3d 1305, 1311 (11th Cir.1999); *Kukla,* 647 F.Supp. at 808; *Wieland v. City of Arnold,* 100 F.Supp.2d 984, 987–989 (E.D.Mo.2000). As discussed in its statement of the intermediate scrutiny test and its analysis of the regulation at issue, the Court finds some of the *Pickering–Kelley* factors to be important to the intermediate scrutiny analysis in this case. However, the Court hesitates to refer to its intermediate scrutiny analysis as the *Pickering–Kelley* balancing test.

In the Court's view, *Pickering–Kelley* is more appropriately applied in the context of regulations impacting a public employee's free speech rights under the First Amendment. Courts that have applied *Pickering–Kelley* to association rights have done so by analogy, and even then, at least one circuit court has recognized that *Pickering–Kelley* is not appropriately applied to cases involving only association and not speech. *See e.g. International Association of Firefighters, Local No. 3808 v. City of Kansas City,* 220 F.3d 969, n. 3 (8th Cir.2000) (recognizing validity of analogy to *Pickering–Kelley,* but applying intermediate scrutiny where freedom of association is at stake).

pass constitutional muster. Defendants contend that the Code's prohibition on a correction officer's relationships with an offender is necessary to ensure discipline between the prison's staff and the inmates. Although the Court concludes that the orderly functioning of prisons is an important government interest, the Court cannot conclude that the Code's prohibition is substantially related to that interest.

Defendants contend that non-incarcerated offenders may know individuals inside the prison who are under the supervision of the staff person and may improperly influence the staff person to treat such individuals differently thereby compromising the rules and security of the prison. However, the Code does not prohibit relationships between prison employees and persons outside the Delaware prison system who know inmates under the employee's supervision. (Tr. A 28:9–13.) For example, under the Code an employee may live with a racketeer or gangster convicted in another state, who knows inmates under the employee's supervision. (Tr. A 18:20/29:3.) In the Court's view, this situation may create just as much of a security risk as living with a non-incarcerated offender who knows other offenders in the prison. Accordingly, the Court cannot conclude that Article 16 is substantially related to the goal of ensuring discipline and security within the prisons.

Additionally, in the circumstances of this case, Defendants have acknowledged that Plaintiff's relationship with Mr. Via did not have a security impact, did not adversely affect her work performance, and did not have a negative impact on the staff or the institution. Defendant Kearney monitored Plaintiff's performance and discussed her performance and the impact of it on the institution with Deputy Warden Bowen. Deputy Warden Bowen never reported any problems with Plaintiff's job performance, any cause for concern regarding Plaintiff's safety, or any adverse impact on the institution as a result of Plaintiff's relationship with Mr. Via. (Tr. A 95–96.) Indeed, Defendants have stipulated that:

> x. Plaintiff's excellent work performance and attitude remained uncompromised through September 27, 1995. In fact, Plaintiff's direct supervisor at the Department, Helen Lowman, SCI Deputy Warden Bowen, and Warden Kearney have all stated that Plaintiff was at all times an excellent correctional officer, and that there was no adverse change in Plaintiff's work performance or attitude following December 30, 1994.

> y. Plaintiff's work performance played no part in the Department's decision to terminate her employment.

(D.I. 98 at 7.)

■ Moreover, Defendants took no additional security measures as a result of Plaintiff's relationship with Mr. Via, and tolerated the relationship for months before deciding to terminate Plaintiff. (Tr. A 99:13–100:1; 101–103.) Where, as here, an individual's off-duty relationships have not had a significant negative impact on his or her job performance, courts have concluded that inquiry into those activities and adverse employment action taken against an individual as a result of those activities violates the individual's right to privacy and freedom of association. *See e.g. Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983); *Briggs v. North Muskegon Police Dept.*, 563 F.Supp. 585 (W.D.Mich.1983).[5]

---

5. Defendants contend that an employee's conduct need not be actually disruptive to the work place, and that the employer's response to a perceived disruption is entitled to considerable judicial deference. However, the Third Circuit has required the employer to show that the conduct at issue was "in fact, likely to be disruptive." *Watters v. City of Philadelphia*, 55 F.3d 886, 899 (3d Cir.1995) (involving freedom of speech). In the cases

To the extent that Defendants contend that the Code's prohibition on trafficking with offenders serves the public interest by preventing the Department from being discredited in the public's eye, the Court likewise concludes that while this interest is important, the Code's prohibition is not substantially related to this purpose. By its express terms, the Code condones prior officer/inmate relationships of blood, marriage and friendship. In pertinent part, Article 18 of the Code of Conduct provides:

Upon learning of the commitment to the Department of a friend or relative, staff shall notify the facility/institution/office head, in writing, of such a relationship. New staff shall advise [of] the existence of such relationships upon accepting employment with the Department or upon discovery, if not known at the time of accepting employment.

(D.I. 98 at u.) Thus, the Department does not disqualify an individual from employment because of his or her relationship with an offender. In fact, Defendant Machtinger testified that he was not aware of a single applicant who had been rejected because they reported a pre-existing relationship with an offender. (Tr. A 58:22–25.) Defendant Machtinger also testified that the Department does not keep track of how many new employees have prior relationships with offenders. And, once

these prior relationships are reported, Defendant Machtinger testified that the Department takes no action, other than to train employees of the dangers of associating with offenders and to take steps to avoid direct supervisory contact. (Tr. A 59:19–60:2.) Because Article 16 of the Code is not substantially related to an important government interest, the Court concludes that Article 16 is unconstitutional and the application of Article 16 to Plaintiff which resulted in her termination is a violation of her constitutional rights to freedom of association and privacy.

D. *Whether The Code Of Conduct's Prohibition Against Contact With An Offender Withstands A Reasonableness Standard Of Review*

Defendants disagree with the application of intermediate scrutiny to the instant case. Instead, Defendants urge the Court to apply the reasonableness standard of review enunciated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) for determining the validity of a prison regulation claimed to have infringed on an inmate's constitutional rights.

The Court is not persuaded that the *Turner* standard is the appropriate standard of review to apply in this case. The *Turner* standard of review is applied when an inmate's constitutional rights are impli-

cited by Defendants, the employer was able to show that the employee's conduct gave rise to staff complaints, and thus, was in fact, likely to cause disruption. *See e.g. Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir.1995) (recognizing that white police officer who dressed in blackface had "potential to disrupt working relationships" at the police department where several black officers resigned and had negative reactions, and there was evidence of previous racial tensions on the force). In this case, Defendants have not proved that Plaintiff's conduct was likely to be disruptive. Defendants have offered no evidence establishing that Plaintiff's conduct had any impact

whatsoever on the staff or the inmates. Defendant's received no complaints about Plaintiff. In fact, the evidence shows that the only disruption in the Department as a result of Plaintiff's conduct was caused not by Plaintiff, but by Defendant's decision to use the Code as a basis to terminate her. Further, that Defendants condoned other relationships between inmates, parolees, and staff in the past also belies their contention that Plaintiff's conduct was likely to cause disruption. For a discussion of the other relationships tolerated by Defendants, see *infra* Section II of this Memorandum Opinion.

cated. In this case, however, the constitutional rights being advanced by Plaintiff are not those of an incarcerated inmate, but those of a correctional officer, a state government employee.[6] Nevertheless, as an alternate basis for its holding in this case, the Court will review the Code's prohibition on contact with an offender under the *Turner* reasonableness standard of review.

 Under *Turner*, a regulation passes constitutional muster if it is reasonably related to legitimate penological interests. In applying this standard, the Court must weigh four factors: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the circumscribed right; (3) the costs that accommodating the right would impose on guards, other inmates, and the allocation of prison resources generally; and (4) whether there are alternatives to the regulation that would fully accommodate the circum-

scribed right at a de minimis cost to valid penological interests. 482 U.S. at 89–91, 107 S.Ct. 2254.

 Weighing these factors in the light of the facts and circumstances of this case, the Court concludes that the regulation at issue fails to pass constitutional muster. First, there must be a valid, rational connection between the regulation at issue and the government interest advanced to justify it.[7] "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89–90, 107 S.Ct. 2254. In this case, Defendant's primary goal is to avoid compromising prison security. Although this is a legitimate goal, the Court cannot conclude that there is a logical connection between the regulation and the asserted goal. Defendants have not presented the Court with any credible evidence showing that the rule is necessary for security. From 1776 until 1988, Defendants did not have any written rules restricting off-duty

---

6. Although the Court observes that the rights at issue in this case are those of a non-prisoner, the Court also recognizes that the Supreme Court has, in dicta, refused to consider the identity of the individuals whose rights have allegedly been infringed. *Thornburgh v. Abbott*, 490 U.S. 401, 411 n. 9, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). For this additional reason, the Court believes an alternative holding under the *Turner* reasonableness standard is warranted.

7. Plaintiff contends that the irrationality of Article 16 has been conclusively established by the Delaware Supreme Court's decision in the context of Plaintiff's claim for unemployment benefits. In its decision, the Delaware Supreme Court affirmed the Superior Court's finding that the Department "failed to establish a rational connection between its Code of Conduct and the promotion of safety." *Department of Corrections v. Toomey*, 1997 WL 537294, 1997 Del. Lexis 286 (Del. Aug. 20, 1997) (PX 21.) Thus, Plaintiff contends

that relitigation of this issue is barred by the doctrine of collateral estoppel. The Court disagrees with Plaintiff. Collateral estoppel requires identical issues. Although the Delaware Supreme Court considered the rationality of the Department's Code of Conduct, it did so in the context of an unemployment case in which the primary issue for consideration was whether the State had shown just cause for Plaintiff's termination. Because the context and analysis for an unemployment decision is different from the context and analysis for Plaintiff's constitutional claim, the Court concludes that the doctrine of collateral estoppel does not apply. *See* Restatement 2d Judgments § 27, Comment j (noting that relitigation of an issue that has been actually litigated is still not appropriate where a new determination is warranted by the quality and extensiveness of the procedures followed in the two courts or where there is a clear and convincing need for a new determination).

relationships with offenders. Defendants did not present any evidence of a security incident justifying a change in policy, and Defendants have not proven a rational link between the regulation and security. For example, many "offenders" within the meaning of the regulation are probationers who were never incarcerated or who may have been incarcerated at other institutions. Defendants have not presented the Court with any credible evidence demonstrating that unincarcerated probationers or probationers formerly incarcerated at an institution other than the employee's institution would have any motive to compromise security at a prison where they have never been. Indeed, in the case of Plaintiff, Defendants themselves did not believe that Plaintiff's relationship with Mr. Via compromised security at the prison. Defendants took no additional security measures and tolerated Plaintiff's relationship for nearly six months. Further, Defendants have tolerated off-duty relationships between inmates and prison employees in the past, some of which posed a greater security risk than Plaintiff's relationship with Mr. Via without taking any measures to prevent direct supervisory contact between the employee and the inmate known to the employee.[8] (Tr. A 185–189, 208–211.)

The Court also observes that the Department provides no alternative means for the exercise of Plaintiff's right to private association. Article 16 precludes Plaintiff from maintaining a private, off-duty relationship in her own home. The reach of this regulation extends beyond Plaintiff's work hours and work place, and thus, provides her with no alternative means of exercising her right to associate with Mr. Via.

The Court further concludes that there would be little impact on the Department if it were to accommodate Plaintiff's right to associate with Mr. Via. No adverse reaction by the staff or other inmates was reported to Defendants during the time that Plaintiff remained on staff. Plaintiff's relationship was off-duty and did not require Defendants to take any additional steps insofar as security was concerned. Defendants did not transfer Plaintiff or any other inmate as a result of her relationship with Mr. Via. In the event Mr. Via were to be reincarcerated at the institution in which Plaintiff works, Defendants could transfer him or Plaintiff to another institution to avoid a situation in which Plaintiff would be directly supervising her husband. Indeed, Defendants testified that they have routinely permitted such transfers in the past. For example, Defendant Kearney testified that the standard reaction to a pre-existing employee/offender relationship is to effectuate a transfer of the inmate. However, if the inmate is only to be incarcerated for a short period of time, the inmate may not even be transferred. (Tr. A 104–105.) Further, Defendants have not provided the Court with evidence suggesting that such transfers negatively impact the prison and/or its operations.

Lastly, the Court observes that alternatives to an outright ban on off-duty contact with an offender are available to Defendants. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 482 U.S. at 90–91, 107 S.Ct. 2254. Although "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint," the existence of other alternatives that would accommodate the restricted right at a de minimis cost to penological interest ren-

---

8. For a more detailed discussion of the relationships tolerated by Defendants, see *infra* Section II of this Memorandum Opinion discussing the void for vagueness doctrine.

ders the regulation unreasonable. *Id.* As the Court has discussed, Defendants routinely permit inmates to be transferred to avoid supervisory contact which may jeopardize security. Defendants also have the option of transferring the correctional officer. Because alternatives exist which are already part of the routine practice of the Department, the Court cannot conclude that these alternatives have more than a de minimis impact on the operation of the prison.

In sum, the Court concludes that the *Turner* factors weigh in favor of a conclusion that the Code's prohibition on offender contact as presently written and applied is unreasonable. Accordingly, even under the more deferential reasonableness test urged by Defendants, the Court concludes that Article 16 is unconstitutional.[9]

## II. Whether The Code's Prohibition Against Contact With An Offender Is Void For Vagueness

■■■ Plaintiff next contends that even if Article 16 of the Code survives intermediate scrutiny, it is void for vagueness. A statute or regulation is void for vagueness if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). A main purpose of the void for vagueness doctrine is to ensure fair and non-discriminatory application of the law.

*Kreimer v. Town of Morristown,* 958 F.2d 1242, 1266 (3d Cir.1992). Thus, the void for vagueness doctrine "finds repulsive laws that endow officials with undue discretion to determine whether a given activity contravenes the law's mandates." *Id.* An unconstitutionally vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Vagueness concerns are particularly implicated where a law or regulation has no clarifying interpretation or settled usage and is so unclear that it requires a person to guess at its contours or misleads a person into believing he or she is compliant with it. *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

■■■ In this case, the Court concludes that Article 16 of the Code is void for vagueness, because it is potentially open for discriminatory enforcement, fails to set forth clearly the conduct that is prohibited, appears to create a safe harbor for employees who report the allegedly infringing relationship, and fails to notify an individual of the disciplinary measures that could be taken for a violation of its prohibition. With regard to discriminatory enforcement, the Court observes that the Department does not have a single, central office for dealing with reported Code violations.

---

9. In the context of discussing the *Turner* standard of review, Defendants cite to several cases which they contend support the proposition that rules forbidding a correctional officer's personal associations with felons or active probationers are well-founded. Defendants' cases are not decisions of the Third Circuit, and therefore, they are not binding on this Court. Further, several of the cases are factually distinguishable from the instant case. *See e.g. Ross v. Clayton County,* 173

F.3d 1305 (11th Cir.1999) (involving rule prohibiting off-duty relationships with offenders, but containing an exception mechanism whereby approval could be granted for the relationship); *Keeney v. Heath,* 57 F.3d 579 (7th Cir.1995) (involving correctional officer who began a romantic relationship with an incarcerated inmate while on the job). Accordingly, the Court is not persuaded that these cases are applicable to the issues in the instant case.

(Tr. A 56:17–24.) Rather, the initial responsibility for reporting a relationship that violates the Code rests with the individual officer. Some officers will report casual contact with an offender, while others will not, and the Department expects the individual officer to determine whether the contact is serious enough to report. (Tr. A 55.) Further, the individual officer usually makes the report of offender contact to his or her immediate supervisor, and it is up to that supervisor to determine whether the contact is serious enough to warrant taking further action or reporting it further up the chain of command. (Tr. 55–56.) Indeed, Defendants Machtinger and Watson recognized that there are no written standards advising individuals within the chain of command how to exercise their discretion regarding offender contact, and each person in the chain of command is expected to utilize his or her own judgment and discretion. (Tr. A 57:4–11; Tr. A 139:12–21.)

Although the prohibition on offender contact in the Code is a blanket prohibition, Paul Howard, the chief of all bureaus in the Department of Correction, testified that he would permit certain contact "based on what I feel is the intent of the Code of Conduct as it relates with friends and/or relatives." (Tr. B 19:16/20:1.) However, when asked about contact that implicates public trust issues, Mr. Howard testified that "I as an administrator have the latitude to review that situation and make that call." (Tr. B 19:22–25.) For example, Mr. Howard testified that he might approve an employee's request to host a brother on probation, but that he would not approve an employee's request to host a friend on probation. However, Ms. Renard, Chief of the Bureau of Community Corrections, indicated that she had many probationers living with prison employees and that many probationers are placed with prison employees as hosts immediately after their release from prison.

(Tr. B 119.) Although Bureau Chief Renard was aware of these relationships, Defendant Kearney indicated that he never received a report of employee relationships with parolees. (Tr. A 107, B 119.) Again, this evidence highlights the arbitrary nature of the Code's prohibition. Either prison employee relationships with parolees are not being reported to the Department's supervisors, or they are being reported and routinely dismissed by lower-level supervisors as not violative of the Code.

In addition, Plaintiff presented credible evidence that Defendants have administered the Code and disciplinary measures for Code violations in an arbitrary and discriminatory manner. The Court finds two examples particularly persuasive, the example of Correctional Officer Robert Cassasse and the example of a former inmate James Burke. Officer Cassasse was hired by the Department in April 1987. (Tr. A 204.) After he was employed, his wife's brother, Mr. Hall, was arrested and incarcerated at SCI. (Tr. A 207.) Mr. Hall never knew his wife's brother until shortly before he was incarcerated. (Tr. A 209:23–25.) Officer Cassasse notified his supervisor of his relationship to his brother-in-law, but no significant action was taken with respect to Officer Cassasse. (Tr. 207:5–6.) The Department merely had a talk with Officer Cassasse and asked him if Mr. Hall's presence would interfere with his ability to do his job. Officer Cassasse indicated that there was no problem, and Defendants took no further action. (Tr. 207:9–13.) Defendants did not transfer Mr. Hall and did not transfer Officer Cassasse. (Tr. 207:14–19.) In fact, Defendants even permitted Officer Cassasse to have direct supervisory contact with his brother-in-law while he was incarcerated. (Tr. 207:20–22.) This type of relationship, a direct supervisory relationship

over an incarcerated individual known to the correction officer, poses an arguably greater security threat than Plaintiff's relationship with a parolee. Yet, the Department tolerated and indeed, permitted this relationship without taking any disciplinary or remedial actions. Further, the Warden at SCI later permitted Officer Cassasse and his wife to serve as residential hosts for overnight visits while Mr. Hall was on work release. (Tr. A 209.)

With regard to the situation involving James Burke, Mr. Burke was a former member of the Pagans and an incarcerated inmate in Delaware for twelve years on charges of rape and conspiracy. (Tr. A 185.) While incarcerated at SCI, Mr. Burke met SCI employees, William Post, Scott Morgan, Diane Ranger and Veronica Walls. (Tr. A 186.) These employees supported a commutation petition on behalf of Mr. Burke and offered to serve as a support group for Mr. Burke upon his release from prison to help him transition back into society. (Tr. 185–186.) Defendant Watson expressly approved a letter request from Mr. Post for himself, Ranger, Walls and Morgan to have off-duty contact with Mr. Burke, a newly released parolee. (Tr. A 111, PX 4.) To date, Mr. Burke continues to associate with these prison employees, vacationing with them, dining with them, and spending time with them. (Tr. A 188–189.)

Further, Mr. Burke began an intimate relationship with Ms. Walls, a correctional counselor at SCI, and in November 2000 Ms. Walls and Mr. Burke married. (Tr. A 179–180.) Although Defendants heard that Ms. Walls may have a relationship with Mr. Burke, they never investigated the relationship or questioned Ms. Walls about the relationship. (Tr. A 113–114, 181–182, C 14:3–11.) Indeed, there has been no change in Ms. Walls' working relationship with inmates or prison employees as a result of her relationship with Mr. Burke, and Ms. Walls has been continuously employed within the secure areas of SCI from 1994 to date. (Tr. A 181:14–20, 183:18–20.)

Although these relationships were permitted by Defendants, Plaintiff presented other examples of seemingly less innocuous relationships which were not tolerated by Defendants. For example, Defendant Taylor himself was prohibited from having contact with a member of his family who was subsequently committed to the supervision of the Department. (Tr. A 32–22.) Defendant Taylor maintained a close relationship with this individual prior to his incarceration. Although Defendant Taylor did not work in the institution in which this individual was housed, a decision was made that he was to have no contact, either on-duty or off-duty with this individual. Thus, while the text of the Code purports to ban all offender contact, as a practical matter, the practice of the Department is to make ad hoc, case-by-case, supervisor-by-supervisor determinations as to which contact is permissible and which contact is not, which contact warrants disciplinary measures and which does not, and which disciplinary measure is appropriate and which is not. This is precisely the type of unbridled, standardless discretion, that the void for vagueness doctrine seeks to prevent.

In addition to the lack of uniformity in supervisors' application of the Code, Plaintiff's evidence also established that the Code is not applied uniformly to all staff. Pursuant to a collective bargaining agreement with AFSCME 247, the union representing correctional officers who work in the kitchens, in fleet services, farms, stores, warehouses, plant maintenance, recreation and educational programs, correctional captains, lieutenants, employees in prison industries, prison counselors and a

variety of clerical positions, the Code of Conduct cannot be used as a basis for disciplinary action. (Tr. A 45, 47–48.) However, if the prohibition against off-duty contacts with offenders is necessary for security reasons, it would appear to the Court that it should apply with equal force to all individuals in a supervisory capacity whether they work in a prison's kitchen or in a prison's commissary, like Plaintiff. That the Code is not applied uniformly to all prison staff, particularly supervisory staff, renders its enforcement, in the Court's view, discriminatory and arbitrary.

In addition, Plaintiff's evidence established that there is confusion over the meaning of terms used in the Code. For example, Defendant Watson testified in his deposition that he considered the term "offender" to include any person who had ever been committed to the Department, even a former parolee who was no longer under active supervision of the Department. (Tr. A 137:13–20.) In contrast, Defendant Taylor read the term "offender" to exclude offenders discharged from supervision of the Department, but Defendant Taylor could identify no basis for distinguishing between current offenders and discharged offenders. (Tr. A 21:18–22.) A regulation susceptible to varying interpretations depending on the discretion of the supervisor applying the Code is the paradigm of an impermissibly vague law.

The confusion over the meaning of the Code's prohibition also extends to the employees subject to the Code. While the Code contains some language that an employee can be disciplined for a violation of the Code, this language was eviscerated by union agreements, and as a practical matter such discipline has never occurred. In fact, Defendant Machtinger recognized that Plaintiff was the first employee of the

Department to ever be disciplined for a violation of the Code. (Tr. 44:4–7.) Further, other prison policies appear to create a safe harbor for employees who report conduct violative of prison procedures. For example, Prison Procedure 8.9, provides:

> It is the responsibility of each employee to report without reservation or fear of reprisal any behavior inconsistent with this procedure.

(PX 3.) [10] The purpose of such safe harbor language is to encourage reporting so that prison supervisors can transfer inmates or guards and/or take other appropriate action to avoid supervisory conflicts and security risks. If employees are punished for reporting relationships, it would discourage them from further reporting thereby impairing the Department's ability to maintain security. (Tr. B 117:3–13; B116:13–17; B 11:18–23.)

The misleading affect of the Code and the Department's policies is epitomized by Plaintiff's situation. When Plaintiff reported her relationship to Defendant Kearney, and Defendant Kearney discussed the relationship with Defendants Taylor and Machtinger, no one suggested that Plaintiff could be subject to termination. (A 12:24–25:1, B 1843–1884, C 32:10–11, 20–23.) Indeed, Defendant Kearney testified that there were conversations back and forth about what type of penalty should be imposed. During this time, Plaintiff was permitted to continue in her job, and Defendant Kearney was confident that she could continue to do her job without posing any security risks or other problems for the prison. (Tr. 96–97.)

In March of 1995, Helen Lowman, Plaintiff's direct supervisor completed a disciplinary investigation of Plaintiff. (Tr. A

10. Like Article 16 of the Code, Prison Procedure 8.9 deals with relationships between staff and inmates.

96.) Although this report suggested that some discipline may be necessary, the report never mentioned the possibility of termination and specifically noted that Plaintiff was a "good employee in the past" with several commendations, perfect score performance reviews and outstanding yearly evaluations. (DX3 at 5–6.) Two months later, in May 1995, Deputy Warden Avery Bowen forwarded a memo to Defendant Machtinger about Plaintiff. Although Deputy Warden Bowen concluded that Plaintiff violated Article 16 of the Code, he never suggested that she should be terminated for this violation. And, like Lowman's report, Bowen's report noted Plaintiff's excellent past performance and further observed that, despite her relationship with Mr. Via, Plaintiff's performance continued to be unchanged. (PX 10 at 2.) Indeed, it was not until June 5, 1995, nearly six months after her initial report, that Plaintiff was told that she might be subject to termination for her relationship with Mr. Via. (Tr. A 50:7–16, 51:16–20.) Thus, for a period of six-months, Plaintiff was permitted to remain in her position and was not informed of the possibility of termination. Where, as here, a regulation is so unclear that it fails to give employees any notice that they may be subject to discipline, and it takes officials administering the regulation six months to determine what type of discipline should be administered because there are no guidelines for applying the rule, the Court concludes that the regulation is void for vagueness.

## IV. Whether The Code's Prohibition On Contact With An Offender Is Unconstitutionally Overbroad

▇▇▇▇ Even if Article 16 of the Code was not impermissibly vague, the Court concludes that Article 16 is constitutionally invalid because it is overbroad. A clear and precise rule may be overbroad if it prohibits constitutionally protected conduct. The essential inquiry is whether the regulation sweeps into its prohibitions conduct which may not be punished under the First Amendment. *Grayned*, 408 U.S. at 113, 92 S.Ct. 2294. In determining whether a regulation is overbroad, the Court may examine possible applications of the statute in factual contexts other than the case at bar. *NAACP v. Button*, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). A primary concern with an overbroad law is that it threatens individuals who are not before the court, and thus, may chill protected activity.

In the Court's view, Article 16 of the Code is overbroad because it purports to prohibit all relationships with former inmates or former parolees, even relationships which do not have an impact on the security or operations of the Department. Again, Plaintiff's situation epitomizes the overbreadth of the Code's prohibition. Plaintiff was engaged in a personal relationship with a former inmate, who was no longer under the supervision of the Bureau of Prisons. In investigating this relationship over a six month period, Defendants allowed Plaintiff to continue in her job, were unable to identify any security concerns actually caused by Plaintiff's relationship, and were unable to find any negative impact on Plaintiff's job performance as a result of the relationship. Defendants testified that they did not believe that Plaintiff's continued employment jeopardized security within the prison and took no action to change Plaintiff's duties or transfer her, as they would have if they suspected a security risk. (Tr. A 29:22–24; 63:2–7, A 99:25/101:20.)

In addition to Plaintiff's situation, Plaintiff presented evidence, which the Court finds credible, that the overbreadth of the Code's prohibition resulted in a chilling effect on other individuals. For example, Charles Wood testified that he had a personal relationship with Michael O'Farrell,

a family friend he knew since the late 1960s. (Tr. A 197.) Mr. O'Farrell was convicted of income tax evasion and served time at Gander Hill and the Plumber House, a work release center. (Tr. A 197.) Although Officer Wood reported that he knew Mr. O'Farrell to his supervisor Lieutenant Hamilton, Lieutenant Hamilton still permitted Officer Wood to supervise the housing area where Mr. O'Farrell was held. (Tr. A 198.) After Mr. O'Farrell was released, Officer Wood maintained a friendship with him. However, once Officer Wood became aware of the disciplinary measures imposed on Plaintiff for her alleged violation of the Code, Officer Wood ended his friendship with Mr. O'Farrell. (Tr. A 199–200.) Officer Wood was concerned that he too could lose his job as a result of his off-duty contact with Mr. O'Farrell. (Tr. A 199–200.) It is this type of chilling effect, which the overbroad doctrine is designed to prevent. Accordingly, the Court concludes that Article 16 of the Code is unconstitutionally overbroad.

## IV. Whether Defendants Are Entitled To Qualified Immunity

 Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from liability for civil damages in their individual capacities, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Generally, courts approach qualified immunity using a three part inquiry: (1) whether the allegations state a claim for the violation of rights secured by the United States Constitution; (2) whether the rights and laws at issue are clearly established; and (3) whether a reasonable competent official should have known that his conduct was unlawful, in

light of the clearly established law. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

 As the Court of Appeals for the Third Circuit has recognized, the court's "first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all." *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000). Once this threshold inquiry is satisfied, then the Court must determine "whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.*

 In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court elaborated on the meaning of the phrase "clearly established right." Recognizing that the application of this standard turns on whether the legal issue is characterized broadly or narrowly, the Supreme Court concluded that the right allegedly violated must be clearly established in a more particularized, fact specific sense. *Id.* at 639–640, 107 S.Ct. 3034 (citations omitted). As the Court explained:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 639, 107 S.Ct. 3034.

 In interpreting the *Anderson* approach to the "clearly established right" prong of the qualified immunity test, the Third Circuit has rejected a strict reading of *Anderson* which would require near fac-

tual identity between cases. Under the Third Circuit's more flexible approach, "some but not precise factual correspondence to precedent is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions." *Good v. Dauphin County Soc. Serv. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir.1989).

Further, the Third Circuit has concluded that "even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity, if based on the information available to them, they could have believed their conduct would be consistent with those principles." *Id.* This inquiry necessarily requires the court to examine the defendant's conduct and determine the "objective legal reasonableness" of the defendant's actions. *Gruenke*, at 299 ("[A]n official will not be liable for allegedly unlawful conduct so long as his actions are objectively reasonable under current federal law."). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that [that the actions were lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court and Third Circuit have observed, "all but the plainly incompetent or those who knowingly violate the law are protected by qualified immunity." *Gruenke*, at 299 (citing *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

The Court has previously concluded that Plaintiff has established a violation of her constitutional rights to freedom of association and privacy. Accordingly, the Court must determine whether these rights were clearly established and whether a reasonable competent official should have known that his or her conduct was unlawful.

Plaintiff contends that Defendants had ample notice that Plaintiff's rights to privacy and association were clearly established. Plaintiff directs the Court to several cases involving cohabitation arrangements with law enforcement officials in which the courts recognized a right to freedom of association and privacy. *See e.g. Thorne*, 726 F.2d at 470 (state could not consider police cleric's off-duty sexual relationship with a married male officer where relationship did not affect morale or job performance); *Reuter*, 832 F.Supp. at 1424 (holding rule prohibiting off-duty intimate relationship between correctional officer and former inmate was unconstitutional where there was no impact on her job performance); *Briggs*, 563 F.Supp. at 590–592 (concluding that officer's discharge for cohabitating with someone other than his wife was unconstitutional where off-duty activity had no impact on job performance). In the Third Circuit specifically, Plaintiff directs the court to the decision of the District Court for the Eastern District of Pennsylvania in *Shuman*, 470 F.Supp. at 449. In *Shuman*, the court concluded that a police officer's "private sexual activities are within the 'zone of privacy' protected from unwanted governmental intrusion." *Id.* at 459. The *Shuman* court explained:

> There are many areas of a police officer's private life and sexual behavior which are simply beyond the scope of any reasonable investigation by the [Police] Department because of the tenuous relationship between such activity and the officer's performance on the job. In the absence of a showing that a policeman's private, off-duty personal activities have an impact upon his on-the-job performance, we believe that inquiry into those activities violates the constitutionally protected right of privacy.... The evil in such a policy is that it is not narrowly tailored to meet those legiti-

mate interests of the Police Department. . . .
*Id.* Plaintiff also contends that Defendants knew Plaintiff's rights were clearly established based on the research memo prepared by Deputy Attorney General, Elizabeth Maron.

After reviewing the case law in this area and the Maron memo, the Court cannot conclude that the law was clearly established such that no reasonably competent officer would have concluded that the action of terminating Plaintiff was lawful. Although the cases cited by Plaintiff are persuasive, Defendants also cite to cases in which courts have concluded that it was permissible to terminate a member of the law enforcement community based on their private association with another individual. *See e.g. Keeney v. Heath,* 57 F.3d 579 (7th Cir.1995) (upholding regulation which prohibited correctional officer from marrying inmate); *Kukla,* 647 F.Supp. at 810 (holding that it was reasonable to discharge Kuklas for violating police department regulation prohibiting socializing between employees of different ranks and finding that relationship could negatively affect department, particularly in light of previous situation involving Kukla which negatively affected department). While these cases do not involve the precise factual circumstances at issue in this case and are not controlling in this district, the Court concludes that reasonably competent officers could have reviewed the broad spectrum of these cases and disagreed as to the lawfulness of their conduct. Because the Court concludes this case was a close case, the Court concludes that Defendants should be entitled to the benefit of qualified immunity in their individual capacities.

## CONCLUSION

For the reasons discussed, the Court concludes that Article 16 of the Code of Conduct is unconstitutional, and the application of Article 16 to Plaintiff resulting in her termination violated her constitutional rights to freedom of association and privacy. The Court further concludes that Defendants are entitled to qualified immunity.